**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

DEVION GENTRY,

       Plaintiff,

v.                                     CASE NO.  1:17-cv-766

VIRGINIA DEPARTMENT OF CORRECTIONS, *et al.*,

       Defendants.

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

Plaintiff, Devion Gentry #1609917 ("Gentry" or "Plaintiff"), is a Virginia Department of

Corrections ("VDOC") inmate presently incarcerated at Wallens Ridge State Prison.  He filed

this action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act

("RLUIPA") alleging multiple violations of his constitutional rights—all stemming from events

that occurred during his initial intake into VDOC at Nottoway Correctional Center on July 7,

2016.  Specifically, Gentry's claims are as follows:

    A.  Defendants violated his rights under the Fourth Amendment because they did
         not have probable cause to seize his beard;[1]

    B.  Defendants violated his right to due process because he was not "screened before
         having his beard shaved" and "did not have a hearing before being sent to
         segregation after the hair was already cut;"[2]

    C.  Defendants violated his rights under the Eight Amendment because they were
         deliberately indifferent to his safety and authorized the use of force when shaving his
         beard;[3] and

---

[1] Compl., ECF No.1, p.13-14.

[2] Compl., ECF No.1, p.14.

[3] Compl., ECF No.1, p.14.

D. Defendants violated his rights under the Equal Protection Clause because they do not apply the grooming policy universally and the policy itself treats men and woman differently.[4]

E. Defendants violated his rights under the First Amendment and RLUIPA by requiring him to trim his beard hair on the day of his initial intake into VDOC on July 6, 2016 in compliance with VDOC grooming policy;[5]

For the reasons explained below, all of Plaintiff's claims must fail. Defendants respectfully request that this Court grant summary judgment in their favor and dismiss this lawsuit in its entirety.

## AFFIDAVITS

In support of their Motion for Summary Judgment Defendants submit the attached affidavits from the following individuals: A. David Robinson, Chief of Corrections Operations for the VDOC ("Robinson Aff."); and Joseph D. Bateman, a Major at Nottoway Correctional Center ("Bateman Aff."). Additionally, Defendants incorporate by reference the affidavit of D. Lewis ("Lewis Aff.") which was previously filed as Exhibit 1 to their Memorandum in Support of their First Motion for Summary, ECF No. 15-01.

Defendants respectfully request that this Court consider these affidavits as evidence in support of their motion.

## STATEMENT OF UNDISPUTED FACTS

1. Plaintiff, Devion Gentry #1609917, is a Virginia Department of Corrections ("VDOC") inmate presently incarcerated at Wallens Ridge State Prison ("WRSP"). Robinson Aff. ¶¶ 3, 14; Lewis Aff. ¶ 3.

2. Gentry was received at Nottoway Correctional Center ("NCC") on July 7, 2016. Bateman Aff. ¶ 4.

---

[4] Compl., ECF No.1, p.15.

[5] Compl., ECF No.1, p.13, 15.

2

3.      Gentry was transferred from NCC to WRSP on February 3, 2017, where he remains incarcerated.  Robinson Aff. ¶¶ 3, 14; Lewis Aff. ¶ 3.

4.      VDOC Operating Procedure (OP) 864.1, *Offender Grooming and Hygiene*, sets forth grooming standards for all offenders incarcerated in the VDOC.  Robinson Aff. ¶ 4, Enclosures A, B.  These standards were established to facilitate the identification of offenders and promote safety, security and sanitation.  Offenders are permitted freedom in personal grooming within the standards set forth in this procedure.  Hair styles and beards that could conceal contraband, promote identification with gangs, create a health, hygiene, or sanitation hazard, or that could significantly compromise the ability to identify an offender are not allowed. *Id.*

5.      Styles such as braids, plaits, dreadlocks, cornrows, ponytails, buns, Mohawks, partially shaved heads, designed cuts into the hair, etc, or any style that could conceal contraband are not permitted.  Longer hair provides the offender with an additional place to hide contraband, and we have had instances in the VDOC where inmates hid drugs or weapons in their hair.  Shorter haircuts facilitate routine searches by staff because the need to search the hair of male prisoners is essentially eliminated.  Robinson Aff. ¶ 5.

6.      Offenders may also use hairstyles to symbolize gang activity which places staff and other offenders at serious risk.  Some offenders have placed various substances in their hair to bind dreadlocks - including feces - which places the health of staff in jeopardy during searches.  Robinson Aff. ¶ 6.

7.      In addition to security and health concerns, positive identification of each prisoner is important in the event of escape from confinement.  Prisoners with long hair and beards can easily change their appearance so as to compromise the need for rapid identification.  Even

3

inside the prison, positive and quick identification of offenders facilitates the orderly operation of the facility.  Robinson Aff. ¶ 7.

8.      OP 864.1 provides that all VDOC female offenders' hair will also be neatly cut and must be no longer than shoulder length.  Braids and one or two ponytails are allowed.  Hair will be kept out of the face and eyes.  Bangs are permitted but must be kept trimmed above the eyebrows.  Styles such as mohawks, "tailed" haircuts, shaved or partially shaved heads, more than two braids/plaits/ponytails, dreadlocks, cornrows, designs cut into the hair, and any style which could conceal contraband are not permitted.  Female offenders may wear their hair no longer than shoulder length, and may not alter their hair color from the original color.  Female offenders may be required to remove excess facial hair.  Robinson Aff. ¶ 15.

9.      Female prisoners generally do not present the same security and health concerns as does the male prisoner population.  In general, female offenders tend to not be as violent as male offenders, and are not as prone to hide weapons in their hair, or to attempt escape.   In recognition of the fact that females generally wear their hair longer than do males, we allow female prisoners the ability to wear slightly longer hair than the male prisoners.   Robinson Aff. ¶ 16.

10.     VDOC has made special accommodations for male offenders who are persistent violators of the grooming policy by establishing a separate housing unit at Wallens Ridge State Prison.  This housing is known as the Grooming Standards Violator Housing Unit ("VHU").  The objective of the VHU is to manage male offenders who are in violation of the grooming standards pursuant to OP 864.1.  Robinson Aff. ¶ 8.

11.     Gentry has been assigned to the VHU since February of 2017.  While housed in VHU, Gentry can continuously be noncompliant with the grooming standards if he chooses.  If

he chooses to comply with the grooming standards he can be reassigned to a standard general population unit.  Robinson Aff. ¶ 8, Enclsoure B

12.     VDOC operating procedures are routinely updated and amended throughout the calendar year.  Since the day of Gentry's intake into VDOC, July 7, 2016, there have been several updates and amendments to OP 864.1.  Robinson Aff. ¶ 9, Enclosure A (copy of OP 864.1 in effect at the time of offender Gentry's intake on July 7, 2016, with an initial effective date of April 1, 2016); Enclosure B (current copy of OP 864.1, with an initial effective date of August 1, 2016).

13.     On the day of initial intake into a reception or parole violator unit, every offender is given an order to comply with VDOC grooming standards and receives a haircut/shave if needed to comply with OP 864.1.  Robinson Aff. ¶ 11.

14.     However, prior to December 28, 2016, OP 864.1 required that all offenders were treated alike during intake with regard to compliance with the grooming standards, irrespective of their religious affiliations, personal preference, etc.  If an offender refused to cooperate, the use of reasonable force or restraints was authorized to the extent needed to bring the offender into compliance with grooming standards.  After the offender was processed, and in compliance with requirements for VHU consideration, they could request review for possible assignment to the VHU.  Robinson Aff. ¶ 12.

15.     However, as of December 28, 2016, if an offender refuses to comply with the order upon intake to comply with VDOC grooming standards on religious principles, the offender will be charged with Offense Code 133, "Refusal to Obey an Order to Comply with the Department's Grooming Standard," and placed in either pre-hearing detention or placed in general detention at institutions operating under the Restrictive Housing Program.  The offender

5

will then be managed as any other offender who refuses to comply with DOC offender grooming standards. If an offender refuses to cooperate, other than on religious principles, the use of reasonable force or restraints is authorized to the extent needed to bring the offender into compliance with grooming standards. Robinson Aff. ¶ 13, Enclosure C.

16. When Gentry was received at the Reception Unit at NCC on July 7, 2016 he was informed of the grooming policy and stated that he would not trim his beard into compliance due to his religious beliefs. Bateman Aff. ¶ 4, Enclosure A. At approximately 12:30pm Gentry spoke with Counselor Rosch who explained the intake process, and that he would be required to cut his beard that day.

17. NCC staff informed Gentry repeatedly of the requirements of the policy that he must come into compliance before reporting to his assigned housing unit and advised him of the consequences of his failure to comply and that he would be required to trim it that day. Gentry continued with the intake process while numerous staff members made attempts to speak with Gentry and persuade him to come into compliance voluntarily and without the use of any force. *Id.*

18. At 2:30pm, Officer Boyd spoke with Gentry for approximately 30 more minutes using the Corrections Crisis Intervention Training to explain to Gentry VDOC grooming policy and procedures at that time. Gentry continued to refuse to comply with the grooming standards. *Id.*

19. At approximately 3:00pm, supervisory security staff were informed of Gentry's noncompliance and they reported to the intake area—including Defendants Bateman, Ward, Williams, Swann, Boyd. Staff again advised Gentry of the policy at that time that required that if an offender refused to cooperate, the use of reasonable force or restraints was authorized to the

extent needed to bring the offender into compliance with grooming standards.  Despite staffs' efforts to convince Gentry to cooperate with the policy voluntarily himself, without needing to be physically brought into compliance, Gentry continued to refuse to have his beard trimmed by the offender barber or to trim it himself.  *Id.*

20.     After all avenues were exhausted to encourage Gentry to change his mind and agree to come into compliance voluntarily, in accordance with VDOC policy, Major Bateman authorized staff to use the minimum amount of force necessary to safely bring Gentry into compliance.  Bateman Aff. ¶ 6, Enclosure A.

21.      Captain Walton assembled an extraction team to remove Gentry from his cell from the holding area and escort him to the barber chair.  Bateman Aff. ¶ 6, Enclosure A.

22.     Sergeant Swann entered the cell first and used the electric shield to hold Gentry on the ground so the other team members could gain manual control and restrain Gentry. Bateman Aff. ¶ 6, Enclosure A.

23.     The electronic shield was never activated.  Bateman Aff. ¶ 6, Enclosure A.

24.     Handcuffs and leg irons were applied in accordance with security procedures and Gentry was escorted to the barber chair which is approximately 25 feet from the holding cell. Bateman Aff. ¶ 6, Enclosure A.  Because Gentry continued to resist staff he had to be held in the barber chair by the extraction team while Sergeants Williams and Swann used the beard trimmers to trim his beard to ¼ inch as required by OP 864.1 on that date.  Bateman Aff. ¶ 6, Enclosure A.   Only minimal force was ever used to restrain Gentry to ensure both his and staffs' safety.  Bateman Aff. ¶ 6, Enclosure A.

25.     Shortly thereafter, Gentry was assessed by the institutional nurse.  As a matter of VDOC policy, medical staff would have been notified due to the necessity for restraints during

Gentry's haircut.  The nurse noted an abrasion to Gentry's left wrist as a result of him resisting as staff was attempting to restrain him, as well as a small ½ inch laceration to his right forearm. Bateman Aff. ¶ 7, Enclosure A.

26.     At approximately 3:30pm, after being assessed by medical, Gentry was escorted in accordance with VDOC policy to special housing to be housed on pre-hearing detention pending a disciplinary hearing for disobeying an order.  Bateman Aff. ¶ 7, Enclosure A.

27.     Gentry's intake was conducted in accordance with VDOC policy in effect on the day of his intake, July 7, 2016.  Bateman Aff. ¶ 8.

## STANDARD OF REVIEW

A motion for summary judgment is appropriate where "materials in the record" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Yet, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).  The Court should view the evidence and reasonable inferences drawn therefrom in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255.  When, based on the evidence presented, a fair-minded jury could not reasonably find for the plaintiff, summary judgment is appropriate.  *See id.* at 252.

## ARGUMENT

Gentry asserts numerous violations of his constitutional rights which all stem from his initial intake into VDOC at NCC on July 7, 2016.  Specifically, Gentry claims that:

A. Defendants violated his rights under the Fourth Amendment because they did not have probable cause to seize his beard;[6]

B. Defendants violated his right to due process because he was not "screened before having his beard shaved" and "did not have a hearing before being sent to segregation after the hair was already cut;"[7]

C. Defendants violated his rights under the Eight Amendment because they were deliberately indifferent to his safety and authorized the use of force when shaving his beard;[8] and

D. Defendants violated his rights under the Equal Protection Clause because they do not apply the grooming policy universally and the policy itself treats men and woman differently.[9]

E. Defendants violated his rights under the First Amendment and RLUIPA by requiring him to shave his beard hair to comply with VDOC grooming policy on the day of his intake into VDOC on July 6, 2016;[10]

For the reasons explained below, all of Plaintiff's claims must fail.  Furthermore, Defendants are entitled to qualified immunity on Plaintiff's claims because the conduct complained did not constitute a violation of any constitutional right, did not transgress any bright lines, and was not a knowing violation of established law.  Defendants respectfully request that this Court grant summary judgment in their favor and dismiss this lawsuit in its entirety.

### A. Fourth Amendment Claim

Plaintiff's Fourth Amendment claim is that Defendants violated his Fourth Amendment

---

[6] Compl., ECF No.1, p.13-14.

[7] Compl., ECF No.1, p.14.

[8] Compl., ECF No.1, p.14.

[9] Compl., ECF No.1, p.15.

[10] Compl., ECF No.1, p.13, 15.

rights because they "did not have probable cause to seize the Plaintiff's beard,"[11] in order to cut his hair to comply with VDOC grooming policy on the day of his intake into VDOC on July 6, 2016.  Plaintiff's claim must fail because Fourth Amendment protections do not apply under these circumstances, and therefore he has failed to state a cognizable constitutional claim. Furthermore, even if Plaintiff's beard was seized within the meaning of the Fourth Amendment, any such seizure was reasonable and did not violate Plaintiff's Fourth Amendment rights.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  The applicability of the Fourth Amendment turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Hudson v. Palmer*, 468 U.S. 517, 525 (1984) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).  "Generally, inmates do not have a reasonable expectation of privacy in the prison environment." *DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 324 (E.D.Va. 2000).

In *Hudson*, the Supreme Court held that an inmate has no reasonable expectation of privacy, and thus no Fourth Amendment protection, in his prison cell, given "the paramount interest in institutional security."  468 U.S. at 528, n.8 ("A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.").  However, more recently, the Fourth Circuit assumes "that the Fourth Amendment continues to apply to lawfully confined prisoners' before weighing the competing interests to determine the reasonableness of a search." *King v. Rubenstein*, 825 F.3d 206, 214-15 (4th Cir. 2016) (quoting *Jones v. Murray*, 962 F.2d 302, 307 (4th Cir. 1992)).

---

[11] Compl., ECF No.1, p.13.

Five years before *Hudson*, in *Bell v. Wolfish*, "the Supreme Court 'developed a flexible test to determine the reasonableness of a broad range of sexually invasive searches.'" *King v. Rubenstein*, 825 F.3d 206, 214-15 (4th Cir. 2016) (quoting *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011)). In *King* the Fourth Circuit held that despite the Supreme Court's holding in *Hudson*, under *Bell v. Wolfish*, 441 U.S. 520 (1979), "prisoners retain an interest in *some* degree of bodily privacy and integrity." *King*, 825 F.3d at 214-15 (emphasis added). "Under *Wolfish*, a court is to consider the following factors to determine the reasonableness of the search: 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *King*, 825 F.3d at 214–15 (quoting *Wolfish*, 441 U.S. at 559).

In this case, the *Wolfish* factors indisputably weigh in the favor of reasonableness. Turning to the first factor, scope of the intrusion, the cutting of hair is not an extreme intrusion, but rather "commonplace." *See King*, 825 F.3d at 215. The plaintiff in *King* underwent surgery to remove marbles he had implanted in his penis prior to being incarcerated. *Id.* The Court found the scope of that search to be so extreme that it weighed in favor of a finding of unreasonableness. *Id.*; *see also Sanchez*, 590 F.3d at 45 (finding scope egregious where plaintiff alleged that he was "slashed and mutilated" during surgery, that his "life and health were jeopardized," and that he experienced "severe physical and emotional pain" as a result). Unlike the facts in *King*, in this case a beard trimming is minimally intrusive at most, it does not cause physical pain, it is not permanent, and does not involve a search inside the body. It cannot be categorized as "extreme," and therefore strongly favors finding the search reasonable.

Turning to the second factor, the manner in which the search was conducted, also favors finding the search reasonable. The haircut was done as a part of regular intake procedure. There

was no risk of injury to Gentry based on the manner in which the search was conducted.

Turning to the third factor, the justification for the search, VDOC has a compelling interest in maintaining safety, sanitation, and security within the prison. OP 864.1, sets for grooming standards that were established to facilitate the identification of offenders and promote safety, security and sanitation.  Offenders are permitted freedom in personal grooming within the standards set forth in this procedure.  Hair styles and beards that could conceal contraband, promote identification with gangs, create a health, hygiene, or sanitation hazard, or that could significantly compromise the ability to identify an offender are not allowed.  Styles such as braids, plaits, dreadlocks, cornrows, ponytails, buns, Mohawks, partially shaved heads, designed cuts into the hair, etc., or any style that could conceal contraband are not permitted.  Security is of paramount importance in a prison setting.  Longer hair provides the offender with an additional place to hide contraband, and we have had instances in the VDOC where inmates hid drugs or weapons in their hair. Offenders may also use hairstyles to symbolize gang activity which places staff and other offenders at serious risk.  Shorter haircuts facilitate routine searches by staff because the need to search the hair of male prisoners is essentially eliminated.  Some offenders have placed various substances in their hair to bind dreadlocks - including feces - which places the health of staff in jeopardy during searches.  In addition to security and health concerns, positive identification of each prisoner is important in the event of escape from confinement.  Prisoners with long hair and beards can easily change their appearance so as to compromise the need for rapid identification.  Even inside the prison, positive and quick identification of offenders facilitates the orderly operation of the facility. All of these considerations favor finding the search reasonable.  And finally, turning to the fourth factor, the place where the search was conducted, similarly favors a finding of reasonableness.  The hair cut

was conducted in a barber chair, where all other inmate haircuts are conduct at intake. Therefore, because all four of the *Wolfish* factors indisputably weigh in favor of a finding that the search was reasonable, Gentry has failed to establish a Fourth Amendment claim. This Court recently applied the *Wolfish* factors to an almost identical claim in *Graham v. Jarrell, et al.*, No. 2:16cv63, in which the plaintiff complained of his hair being seized at NCC pursuant to OP 864.1 during his intake in VDOC on March 3, 2015.  This Court concluded that to the extent that the plaintiff's "haircut resulted in a search or seizure of his person or hair that would be subject to the Fourth Amendment's reasonableness requirement, any such seizure or search was reasonable."  Order, *Graham v. Jarrell, et al.*, No. 2:16cv63, ECF No. 85, p.23-24 (Feb. 23, 2018); *see also DeBlasio v. Johnson*, 128 F.Supp.2d 315, 324-25 (E.D. Va. 2000) ("Assuming, without deciding, that the cutting of inmates' hair is a search that is subject to a Fourth Amendment reasonableness inquiry, which it arguably is not, DOP 864 is nonetheless valid.  As in *Jones*, cutting hair and trimming facial hair involves virtually no risk, trauma, or pain. Therefore, the intrusion on inmates' privacy is minor, at the most.  This minor intrusion must be weighed against the VDOC's interests.  As the Fourth Circuit stated in *Hines*, suppressing contraband, limiting gang activity, maintaining discipline and security, and preventing inmates from quickly changing their appearance, are not just legitimate governmental penological interests, they are compelling.  These are the precise interests behind the promulgation of DOP 864.  The court thus finds that the VDOC's compelling governmental and penological interests clearly outweigh the minor intrusion caused by cutting inmate's hair.  Accordingly, under a Fourth Amendment reasonableness inquiry, defendants' claim fails.") (internal citations omitted).

Defendants are entitled to qualified immunity on Gentry's claim that the VDOC Grooming Policy violates his Fourth Amendment rights.  At the relevant time, on July 7, 2016,

there was Fourth Circuit case law upholding the validity of the VDOC Grooming Policy in question. *DeBlasio v. Johnson*, 128 F.Supp.2d 315, 324-25 (E.D. Va. 2000). Therefore, Defendants did not violate clearly established law and are entitled to qualified immunity on this claim.

Accordingly, Plaintiff's Fourth Amendment claim against Defendants should be dismissed.

**B. Due Process Claim**

Plaintiff next claims that Defendants violated his right to due process because he was not "screened before having his beard shaved" and "did not have a hearing before being sent to segregation after the hair was already cut." Because Plaintiff fails to identify a deprivation of a protected interest, his due process claim must fail

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Phiphus,* 435 U.S. 247, 259 (1978). "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). Thus, the first step in analyzing a procedural due process claim is to identify whether the alleged conduct affects a protected interest. *See Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). Where there is no protected interest, there can be no procedural due process violation.

Liberty interests "may arise from the Constitution itself, by reason of guarantees implicit in the word liberty, . . . or [they] may arise from an expectation or interest created by state laws

14

or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations and quotations omitted). To establish a protected interest, "he must (a) 'point to a [state or federal] law or policy providing him with an expectation of avoiding the conditions of his confinement,' and (b) 'demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life,' or 'will inevitably affect the duration' of his confinement." *Cascen v. Clarke*, No. 7:17cv61, 2015 WL 5043121, at *3 (W.D. Va., Aug. 26, 2015) (quoting *Prieto*, 780 F.3d at 252; *Sandin v. Conner*, 515 U.S. 472, 487 (1995)); *see also Puranda v. Johnson*, No. 3:08CV687, 2009 WL 3175629, at *4 (E.D. Va. Sept. 30, 2009) (stating that a plaintiff "must make a threshold showing that the deprivation imposed amounts to an 'atypical and significant hardship' or that it 'inevitably affect[s] the duration of his sentence.'"). "[W]hen a state policy expressly and unambiguously disclaims a particular expectation, an inmate cannot allege a liberty interest in that expectation." *Prieto*, 780 F.3d at 252.

This Court has previously held that "forced grooming after initial intake to the prison is not 'atypical and significant hardship' and is thus not a violation of any protected liberty interest." *McClelland v. Sheriff's Deputy*, No. 2:00cv807, 2001 WL 34826228, at *5-6 (E.D. Va. Mar. 19, 2001). In *McClelland* this Court reasoned that because "[a]ll new inmates are subject to [OP 864.1]," and by policy "those who refuse to cooperate during this initial intake may be forcibly groomed or restrained while they are groomed," "forced grooming is a typical incident of prison life." *Id.* Similarly, in *Barksdale* the District Court for the Western District of Virginia noted that "the grooming policy about which Plaintiff says forced him to shave his beard in violation of his religious beliefs is the same grooming policy applicable to inmates in general population; consequently, it cannot be 'atypical.'" *Barksdale v. Clarke*, 7:17cv355, 2017 WL 3381370, at *7 (W.D. Va. Aug. 4, 2017) (citing *Beverati v. Smith*, 120 F.3d 500, 527-28 (4th Cir.

1997) (noting conditions are not atypical if similarly experienced by the rest of the prison population)).  Because the requirement to comply with VDOC's grooming policy is equally applicable to all inmates, it therefore cannot be atypical.

Furthermore, Gentry fails to establish that his temporary detainment in segregation subjected him to conditions that were harsh and atypical in relation to the ordinary incidents of prison life.  Rather he merely complains that his exercise, commissary access and ability to watch television were restricted for a brief period of time.  Thus, because Plaintiff has failed to identify a deprivation of a protected interest, his due process claim must fail.

Defendants are entitled to qualified immunity on Gentry's claim that his due process rights were violated because he was not "screened before having his beard shaved" and "did not have a hearing before being sent to segregation after the hair was already cut."  At the relevant time, on July 7, 2016, there was Fourth Circuit case law holding that "forced grooming after initial intake to the prison is not 'atypical and significant hardship' and is thus not a violation of any protected liberty interest."  *McClelland*, 2001 WL 34826228, at *5-6; *Barksdale v. Clarke*, 2017 WL 3381370, at *7 (W.D. Va. Aug. 4, 2017).  Therefore, Defendants did not violate clearly established law and are entitled to qualified immunity on this claim.

### C.  Eighth Amendment Claim

Plaintiff next claims that Defendants violated his rights under the Eight Amendment because they were deliberately indifferent to his safety and authorized the use of force when shaving his beard.

#### 1. Deliberate Indifference

The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of inmates.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v.*

16

*Palmer*, 468 U.S. 517, 526-27 (1984).  For this reason, prison officials who are deliberately indifferent to "specific known risks of such harm" violate an inmate's Eighth Amendment right to be free from any resulting physical harm.  *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (citing *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979)).  To establish that prison officials are liable under Section 1983 for failure to protect, a plaintiff must show:  (1) an objective component—that the alleged deprivation was objectively, sufficiently serious, and (2) a subjective component—that the prison officials had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834; *Odom v. South Carolina Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003).

With regard to whether the inmate's deprivation was objectively, sufficiently serious, the Fourth Circuit has cautioned that "[o]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim."  *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).  "To demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions."  *Id.* (internal quotation marks and citation omitted).

As to the second prong of the deliberate indifference analysis, the subjective inquiry requires a plaintiff to establish that the official was "deliberately indifferent" to the inmate's health or safety.  *Farmer*, 511 U.S. at 834.  "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."  *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).  A prison official shows deliberate indifference if he "knows of **and** disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference." *Farmer*, 511 U.S. at 837 (emphasis added).  Thus, "it is not enough that the officers *should have* recognized [the substantial risk of harm] . . . they actually must have perceived it." *Parrish v. Cleveland*, 372 F.3d 294 (4th Cir. 2004) (emphasis added).  "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.  A prison official's duty under the Eighth Amendment is to ensure reasonable safety." *Farmer*, 511 U.S. at 844 (internal quotation marks omitted).

Here, Gentry's claim fails under either prong of the deliberate indifference analysis. Objectively, the simple act of restraining Gentry in handcuffs and leg irons while he received a beard trimming did not expose him to a substantial risk of serious harm.  Metal handcuffs and shaving a beard do not possess inherently dangerous characteristics capable of causing serious injury to the individual being cuffed, unlike for example chemical agents.  *Cf. Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (discussing use of chemical agents in correctional facilities).  The possibility that Gentry might have sustained slight bruising from the use of restraints is not, from an objective viewpoint, sufficiently intolerable to implicate the Eighth Amendment.  Contrary to Gentry's allegations, the record demonstrates that the electrical shield was never activated.

Subjectively, even if the use of restraints to conduct a beard trimming posed a constitutionally-impermissible risk of harm, none of the defendants involved were aware that might cause Gentry to suffer specific injuries.  Defendants lacked subjective awareness that restraining Gentry to give him a beard trim might expose him to a heightened risk of harm.  And the Defendants could not act to alleviate a risk that they did not actually perceive.  *See Farmer*, 511 U.S. at 844 (recognizing that a deliberate indifference claim cannot succeed where prison

officials were unaware of the risk of harm, because "prison officials who lack[] knowledge of a risk cannot be said to have inflicted punishment").  For these reasons, Gentry's deliberate indifference claim against the Defendants fails as a matter of law.

### 2. Excessive force

The Eighth Amendment prohibition against cruel and unusual punishment forbids the "'unnecessary and wanton infliction of pain'" against inmates.  *Whitley v. Albers*, 475 U.S. 312, 316 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)).  Yet, "[n]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'"  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).  "The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 316.  Rather, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Id.*  Thus, the determination of whether an Eighth Amendment violation has occurred through the use of excessive force turns upon "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm." *Id.* at 320-21 (internal quotation marks omitted).

When analyzing an excessive force claim, the following factors are considered particularly relevant:  (1) the need for application of force, (2) the relationship between the need and the amount of force that was used, (3) the seriousness of any resulting injury, (4) the extent

of the threat to the safety of staff and inmates, "as reasonably perceived by the responsible officials on the basis of the facts known to them," and (5) "any efforts made to temper the severity of a forceful response." *Id.* at 321. The ultimate question "is whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.*

Considering the five factors set forth above, the Defendants, who were acting "in a good faith effort to maintain or restore discipline," did not violate Gentry's Eighth Amendment rights by using minimal restraints in order to trim his beard. *See, e.g.*, *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (holding that correctional officers did not use excessive force when they extracted the inmate from his cell to shave the inmate pursuant to the prison grooming policy).

First, the Defendants were faced with a situation requiring the application of some degree of force to ensure that the beard trimming could be performed safely. Second, there is a clear and permissible relationship between the need to use force, and the amount of force that was applied. Defendants performed a routine cell extraction, without the use of any chemical agents or an activated electronic shield. They restrained Gentry with the minimal amount of physical force need in relation to his resistance and to ensure his safety. Defendants did not hit, punch, kick, or otherwise physically assault Gentry, nor did they point or fire a weapon at him or use a chemical weapon. Each officer involved used minimal force appropriately tailored to the circumstances presented.

Third, the injuries that allegedly resulted from the incident by Gentry's own admission— a minor abrasion and a small cut—are relatively minor in nature. Fourth, Defendants reasonably perceived that an unrestrained offender who was continuing to physical resist might pose a threat to the safety of themselves and any other corrections officers in the vicinity and to Gentry

himself.  And fifth, the Defendants tempered the severity of their response:  staff repeatedly attempted for several hours to explain to Gentry that the policy required that he shave that day and tried exhaustively to encourage Gentry to voluntarily (at least physically) comply with the grooming policy by having his beard trimmed by the inmate barber or by trimming his beard himself rather than staff having to use force of any kind.   Considering the above five factors, it is clear that the Defendants did not use excessive force.

The Defendants are entitled to qualified immunity on Gentry's claim that his forced beard trim constituted a violation of his Eighth Amendment right to be free from cruel and unusual punishment.  At the relevant time, on July 7, 2016, there was Fourth Circuit case law upholding the validity of the VDOC Grooming Policy in question.  *See, e.g.*, *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (holding that correctional officers did not use excessive force when they extracted the inmate from his cell to shave the inmate pursuant to the prison grooming policy). Therefore, Defendants did not violate clearly established law and are entitled to qualified immunity on this claim.

### D.  **Equal Protection Claim**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const, amend. XIV.  "The Equal Protection Clause... is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  To survive summary judgment, Plaintiff must demonstrate that: (1) "he has been treated differently from others with whom he is similarly situated," and (2) "the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  If a plaintiff

satisfies the above two requirements, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654 (citations omitted).

Plaintiff generally claims that the only people he knew of that had their hair cut by force were religious people.[12]  However, even accepting that allegation as true, Gentry fails to allege that there were other "non-religious" inmates who did not have to come into compliance with the grooming policy on intake, or whether other inmates merely chose to voluntarily comply.  He also makes unsupported allegations that VDOC did not cut any of the inmates' hair during initial intake that were received from the Virgin Islands.  However, Gentry fails to identify when these inmates were accepted into VDOC.  The policy in effect on the day of Gentry's intake on July 7, 2016 required that all offenders are treated equally during intake with regard to grooming standards, irrespective of their religious affiliations and personal preference.  The current policy still authorized the use of minimal force to being offenders into compliance with the policy, but the amendment added on December 28, 2016 provided an avenue for offenders who object to compliance on a religious basis to be eligible for the VHU without having to come into compliance initially.  These general assertions, without additional support, regarding other inmates' treatment upon intake are not sufficient to establish that he was treated differently than similarly situated persons.

Additionally, Plaintiff alleges generally that male and female inmates are treated differently upon intake despite being potentially convicted on the same underlying crime. However, this Court has held on numerous occasions that that exact allegation fails to establish a Fourteenth Amendment equal protection claim because male and female inmates are not

---

[12] Compl., ECF No.1, p.15.

similarly situated.  *See DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 328 (E.D. Va. 2000)

(concluding that VDOC Operating Procedure 864.1 "survives an equal protection challenge

based on differing standards for males and females"); *accord McClelland v. Sheriff's Deputy*, No.

2:00cv807, 2001 WL 34826228, at *4 (E.D. Va., Mar. 19, 2001); Order in *Graham v. Jarrell, et

al.*, No. 2:16cv63, ECF No. 85, p.29 (Feb. 23, 2018).  Thus, Plaintiff is unable to establish that

"he has been treated differently from others with whom he is similarly situated."  *Morrison*, 239

F.3d at 654.

      With regard to the second requirement that the unequal treatment "was the result of

intentional or purposeful discrimination"—"[t]hough a valid claim of equal protection need not

allege discrimination as the defendant's *sole* motive, it must allege the requisite discriminatory

intent with more than mere conclusory assertions."  *Williams v. Hansen*, 326 F.3d 569, 584 (4th

Cir. 2003) (emphasis in original).  That is, a plaintiff "must put forward 'specific, non-conclusory

factual allegations that establish improper motive.'"  *Id.* (quoting *Trulock v. Freeh*, 275 F.3d 391,

405 (4th Cir. 2001).  Assuming arguendo that Plaintiff is able to satisfy the first requirement by

establishing differential treatment of similarly situated individuals, the record does not show that

any unequal treatment was the result of purposeful discrimination by Defendants.  That is,

although the record suggests that Defendants knew that Plaintiff's refusal to cut his hair stemmed

from his religious beliefs, the record shows that Defendants acted pursuant to the VDOC's

grooming policy, rather than due to any discriminatory purpose.  Furthermore, VDOC's

grooming policy in effect the day of Gentry's intake was absolutely facially neutral and therefore

nondiscriminatory—it required that all offenders be treated equally during intake with regard to

grooming standards, irrespective of their religious affiliations and personal preference.  Viewing

all of the facts and inferences in the record in the light most favorable to Plaintiff, Gentry has

failed to offer evidence from which a reasonable juror could return a verdict in his favor as to his claim regarding violation of his right to equal protection under the Fourteenth Amendment.

The Defendants are entitled to qualified immunity on Gentry's claim that VDOC grooming policy violated the Equal Protection Clause. At the relevant time, on July 7, 2016, there was Fourth Circuit case law upholding the validity of the VDOC Grooming Policy in question. *See DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 328 (E.D. Va. 2000) (concluding that VDOC Operating Procedure 864.1 "survives an equal protection challenge based on differing standards for males and females"); *accord McClelland v. Sheriff's Deputy*, No. 2:00cv807, 2001 WL 34826228, at *4 (E.D. Va., Mar. 19, 2001). Therefore, Defendants did not violate clearly established law and are entitled to qualified immunity on this claim.

**E.  Religious Expression Claims**

Plaintiff claims that Defendants violated his rights under the First Amendment and RLUIPA by requiring him to shave his beard hair in contradiction of his relief beliefs in order to come into compliance with VDOC grooming policy on the day of his intake into VDOC on July 6, 2016.

**1. RLUIPA**

With respect to Plaintiff's RLUIPA claims, the Eleventh Amendment bars suits for damages against Defendants in their official capacities. *Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006). Likewise, under RLUIPA, Plaintiff may not obtain damages from Defendants in their individual capacities. *Rendelman v. Rouse*, 569 F.3d 182 (4th Cir. 2009); *Sossamon v Texas*, 131 S.Ct. 1651 (2011). Plaintiff's request for injunctive relief cannot be grounded in a claim against Defendants in their individual capacities. That is, because Defendants—acting in their individual capacities—would not have the authority to perform the requested actions, any

claims for injunctive relief against Defendants in their individual capacities should be dismissed. *See, e.g., Chadwell v. Brewer*, 59 F. Supp. 3d 756, 761 (W.D. Va. 2014).

Accordingly, the only claims that survive these threshold considerations are official-capacity claims for injunctive relief under RLUIPA.  However, in this case, there are no remaining requests for injunctive relief.  On October 19, 2017, this Court already dismissed Gentry's only request for injunctive relief—to be transferred to a different facility.  Order, ECF No. 12, p. 2.  Therefore, because there is no remaining injunctive relief that may be granted by this Court for Gentry's RLUIPA claim, his RLUIPA should be dismissed.

### 2. First Amendment Claim

The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise thereof."  U.S. Const. amend I.; *Cruz v. Beto*, 405 U.S. 319, 322 (1977 (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quotation and citation omitted).  To state a claim for violation of the First Amendment a plaintiff must allege sufficient facts to show that he holds a sincere religious belief and that prison regulations impose a substantial burden on his right to free exercise of religion.  *See O'Lone*, 482 U.S. at 349.  If the plaintiff establishes that he holds a sincere religious belief, and that is ability to exercise his religion has been substantially burdened by the challenges policies, the prisoner must also show that the prison regulation is not reasonably related to penological interests.  *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997).  Factors relevant in determining the reasonableness of a regulation include:  (1) the connection between the regulation and a legitimate, neutral government purpose, (2) the existence of alternative means of exercising the right, (3) the impact accommodation of the right would have on guards, other inmates, and prison resources, and (4) the absence of "obvious, easy alternatives" to the regulation.  *Turner*, 482 U.S.

at 89-91.  When applying these factors, the court must "respect the determinations of prison officials."  *United States v. Stotts*, 925 F. 2d 83, 86 (4th Cir. 1991).  The plaintiff carries the burden of proof under the *Turner* rational basis analysis to disprove the validity of the prison regulation at issue.  *Overton v. Bazzetta*, 539 U.S. 126 (2003).

Both this Court and the Western District of Virginia have previously upheld OP 864.1 and found that OP 864.1 is reasonably related to penological interests.  *See, e.g.*, *Coleman v. Jabe*, No. 7:11cv518, 2012 WL 7801722, at *16 (W.D. Va. Dec. 26, 2012) ("Applying *Turner's* rational basis factors to Coleman's First Amendment claim regarding the Grooming Policy . . . there is a 'valid, rational connection' between the policy and prison security, safety, inmate health and sanitation for all the same reasons stated above."); *McClelland*, 2001 WL 34826228, at *2-3 (finding that there was no First Amendment violation when the inmate was forcibly groomed on intake because VDOC's grooming policy was reasonably related to penological interests); *see also Deblasio v. Johnson,* 128 F. Supp. 2d at 323 (concluding OP 864.1 did not violate the Free Exercise Clause after finding that VDOC's grooming policy was implemented to help eliminate contraband, reduce gang activity, identify inmates, and maintain order in the prisons).

The Defendants are entitled to qualified immunity on Gentry's claim that the VDOC Grooming Policy violates his First Amendment right to freely exercise his religion.  At the relevant time, on July 7, 2016, there was Fourth Circuit case law upholding the validity of the VDOC Grooming Policy in question.  *Coleman v. Jabe*, No. 7:11cv518, 2012 WL 7801722, at *17 (W.D. Va. Dec. 26, 2012) (citing *McRae,* 261 F. App'x 554); *Coleman v. Jabe*, No. 7:11cv518, 2013 WL 1209014, at *4 (W.D. Va. Mar. 25, 2013) (finding "no particularized violations of any clearly established rights of which a reasonable official would have known").

Therefore, Defendants did not violate clearly established law and are entitled to qualified immunity on this claim.

**F.   <u>Damages and Qualified Immunity</u>**

To the extent that Plaintiff is attempting to bring suit under § 1983 against any of the Defendants in their official capacities for monetary damages, this is not cognizable under § 1983. Neither a state nor its officials acting in their official capacities are persons for purposes of § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989).  Therefore, to the extent that Plaintiff is suing the Defendants in their official capacities, they are immune from suit in this matter. *Id.*  The Eleventh Amendment similarly bars suits for damages against Defendants in their official capacities. *Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006).

Additionally, with respect to Gentry's request for monetary damages, all Defendants are entitled to the defense of qualified immunity, there being no allegations of conduct which violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  The purpose of the qualified immunity doctrine is to protect officers in the performance of their duties unless they are "plainly incompetent" or "they knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 342 (1986). When evaluating a claim of qualified immunity, courts must first ascertain "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).  If so, the second inquiry is whether the defendants' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.  "The unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." *Lopez v. Robinson*, 914 F.2d 486, 489 (4th Cir. 1990); *see also Anderson v. Creighton*, 483 U.S.

635, 640 (1987); s*ee, e.g.*, *Rountree*, 2015 U.S. Dist. LEXIS 28511, at *45-46 (finding

defendants were entitled to qualified immunity where the law did not put them on notice that

disallowing use of a prayer rug during count would be clearly unlawful).

As an initial matter, none of the defendants violated Gentry's constitutional rights.

Because there is no evidence that Defendants' conduct result in the deprivation of Gentry's First,

Fourth, Eighth, or Fourteenth Amendment rights, there is no constitutional violation.

Defendants' conduct, did not violate a constitutional right, did not transgress any bright lines,

and was not a knowing violation of law. *See Schultz v. Braga*, 455 F.3d 470 (4th Cir. 2006).

The plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's

right. *Bryant v. Muth*, 994 F.2d 1082 (4th Cir. 1993).  However, a defendant must demonstrate

that the right was not clearly established at the time of the incident to receive qualified immunity.

*Henry v. Purnell*, 501 F.3d 374 (4th Cir. 2007).  Even assuming that there might have been some

infringement upon Graham's constitutional rights, the unlawfulness of any such action would not

be "apparent when assessed from the perspective of an objectively reasonable official charged

with knowledge of established law." *Lopez*, 914 F.2d at 489.

Reasonable corrections officials, charged with knowledge of established law on July 7,

2016, would not believe that cutting an inmate's hair in compliance with VDOC policy violated

an inmate's constitutional rights.  The standards set forth in OP 864.1 are strictly enforced for all

offenders.  On July 7, 2016, OP 864.1, IV, G, 1(a) required that upon intake all offenders will be

given a haircut if needed to comply with the policy, and OP 864.1, IV, G, 1(b), allowed for the

use of reasonable force or restraints to bring an offender into compliance with grooming

standards upon initial intake—which was equally applied irrespective of inmates' religious or

personal beliefs.  Defendants were following procedure on the day in question and only acted as

a reasonable officer would have acted under the circumstances.

As explained in each section above, this Court has previously addressed almost identical claims and concluded that VDOC's grooming policy was constitutional.  On July 7, 2016, there were no subsequently opinions to discredit or reason to discount this Court's previous holdings. Reasonable corrections officials, charged with knowledge of established law, would not believe that cutting an inmates hair in compliance with VDOC policy, a policy which had been uphold in this Court, violated an inmate's rights under the First, Fourth, Eighth, or Fourteenth Amendments.  *See, e.g.*, *Ragland v. Angelone*, 420 F. Supp. 2d 507, 513 (W.D. Va. 2006) (holding that VDOC officials could reasonably have relied on the district court's reasoning that OP 864.1 satisfied the compelling interest test in RFRA, and consequently, they could also reasonably have believed that the grooming policy met the all-but-identical test in RLUIPA "and so did not violate inmates' clearly established rights").  Therefore, Defendants are entitled to qualified immunity, and the claims against them should be dismissed.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court grant summary judgment in their favor.

Respectfully Submitted,

A. DAVID ROBINSON, HENRY J. PONTON, JR., MAJOR J. D. BATEMAN, CAPTAIN D. H. ANDERSON, LT. K. WILLIAMS, CAPT. M. J. WARD, C/O F. BOYD, and SGT. R. M. SWANN

By: _____/s/_____
Laura H. Cahill, AAG, VSB #86328
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219

Phone:  (804) 371-4482
Fax:  (804) 786-5630
Email:  lcahill@oag.state.va.us

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of 2018, I electronically filed the foregoing

Memorandum in Support of Defendants' Second Motion for Summary Judgment with the Clerk

of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the

following CM/ECF participants: N/A, and I hereby certify that I have mailed by UPS Ground

Service the document to the following non-CM/ECF participant:  Devion Gentry #1609917,

Wallens Ridge State Prison, 272 Dogwood Drive, Big Stone Gap, Virginia 24219.


By:       /s/
           Laura H. Cahill, AAG, VSB #86328
           Office of the Attorney General
           Criminal Justice & Public Safety Division
           202 North 9th Street
           Richmond, Virginia 23219
           Phone:  (804) 371-4482
           Fax:  (804) 786-5630
           Email:  lcahill@oag.state.va.us